# ALBERTO WILL ET AL.

## v.

# J. TORNABELLS & COMPANY ET AL.

San Juan, Equity, No. 154.

1. A request for counsel's advice as to how to commit a fraud is not privileged.

2. The admissions of one against the interest of persons who afterward became his heirs are not admissible against such heirs.

3. Statements by the widow of deceased, intended to impugn the bona fides of transactions to which her husband and other persons, since dead, were parties, are inadmissible.

4. In equity cases, the burden of proof is on the plaintiff to prove the allegations of his bill.

5. In Porto Rico an insolvent debtor may dispose of his property at will to pay all or a portion of his debts. His action in this regard can only be attacked in bankruptcy proceedings.

6. The validity of such a conveyance is not affected by the debtor's intention to hinder, delay, or even to defeat his other creditors.

7. If a creditor preferred in that manner receives no more than his due the transfer will be upheld.

8. Laches on the part of plaintiffs in prosecuting their claim will benefit third parties.

9. The chancery rule of *lis pendens* has no place in Porto Rico, under authority of Romeu v. Todd, 206 U. S. 358, 51 L. ed. 1093, 27 Sup. Ct. Rep. 724.

10. A registered title fully protects innocent purchasers for value, without notice, and probably even with notice of the fraud, after one year's time.

Opinion filed June 22, 1907.

Note.—Effect of debtor's intention to hinder, delay, or defeat his other creditors by conveyance to one ignorant of such intention, see note to Feder v. Ervin, 36 L.R.A. 335.

*Messrs. Horton & Cornwell* and *N. B. K. Pettingill, Esq.,* solicitors for plaintiffs.

*F. H. Dexter, Esq., Herminio Diaz, Esq., Cay. Coll y Cuchi, Esq.,* and *José de Diego, Esq.,* solicitors for defendants.

RODEY, Judge, delivered the following opinion:

This is a creditors' bill filed June 23, 1902, and permitted to remain on the docket of this court during the five years that have since intervened, without any apparent proper or sufficient cause for the unwarranted delay and with infinite inconvenience to many parties connected with the subject-matter of the controversy. The first two years and a half of the time seem to have been taken up with a battle over the proceedings, trying to get the answers of the several respondents settled, and during which time complainants' exceptions to several of the answers were referred to a master, arguments had before him, his report filed, exceptions to the same presented, arguments had on the latter, and briefs submitted in support thereof, and so on, in an interminable and fruitless contest of petitions, motions, exceptions, pleas, demurrers, orders, affidavits, and rules to show cause, without result or real merit as we see it. The next year and a half seem to have been taken up somewhat in the same way and also partly in an application for a receivership, and in opposing efforts to the same, and in efforts to prevent outside parties from foreclosing several mortgages they had on some of the premises involved, that they had secured in the meantime, in enjoining them from so proceeding, and in issuing rules as for contempt against them for their action in that behalf, etc.

When the present incumbent came upon this bench, at a time

when we were not acquainted with the exact status of this suit, an application was made for a receiver, and, as many of the principal parties were agreeable, it was granted, others of the parties opposing. Then more time was taken up with suggesting the several deaths of, and bringing in through bills of revivor, the representatives of the estates of every one of the original respondents. Still more time was occupied with answers, and in and about again enjoining some of the mortgagees and intervening purchasers from attempting to foreclose their alleged liens in the insular courts. Still more time was taken up by the filing of intervening petitions by some additional creditors and the raising of issues thereon. Quite recently, in this present year, and immediately before the hearing had as next hereafter referred to, Rufer & Sons, of New York, who had obtained a judgment in this court on the 2d day of May, 1903, for $13,414.84 and $41 costs, and the Caja de Ahorros de Mayaguez, which had recovered a judgment also in this court, on the 3d day of June, 1903, for $8,470.48 and $41.65 costs, both petitioned and were permitted to intervene as complainants herein, so that the sums claimed by all the complainants combined, amount, with costs, to a total of $51,129.03,—a quite respectable sum, but, as it is said, quite small in comparison to the whole vast assets and liabilities of the house of Tornabells & Company.

Finally, in the spring of the present year 1907, the court managed to force the parties to an issue, and a trial was had at Mayaguez before the court itself, without the intervention of an examiner or master. Seven or eight able counsel appeared for the several parties, which, as stated, include additional complainants and new respondents besides the numerous representatives aforesaid. At the hearing, complainants dismissed as to

the representatives of the original respondent Baudilio Duran, as he in fact never had been cited and his heirs were not to be found within the jurisdiction of the court and could not be served with process, it being stated that they or their ancestor had disposed of their entire interest in the proceeding, and it further being claimed that said Baudilio Duran had been a mere conduit of title, and his heirs therefore were unnecessary parties. This point was strenuously objected to and contested by all the counsel for respondents, particularly by counsel for the American Trading Company, but we think the contention of complainants is sustained by the law.

A hearing of two or three days was had, wherein complainants introduced several large exhibits, showing the transactions or some of them, upon which the bill was based; and also introduced several witnesses with a view to proving the allegations of the bill, most of which witnesses, as the court clearly saw, proved somewhat adverse, and from whom scanty testimony was obtained, although counsel for complainants claim that sufficient was obtained, when considered in connection with the pleadings and exhibits, to entitle their clients to a decree. This contention is strenuously opposed by counsel for all respondents. It will be referred to hereafter. At the end of the hearing, the respondents moved that the bill be dismissed on the ground, among others, that on its face it showed no equity entitling complainants to a decree, and that neither did the so-called proofs adduced show any; and further, because it was claimed that the statute of limitations of one year with reference to conveyances in alleged fraud of creditors, contained in art. 37 of the local mortgage law, had run against the right to file the bill in the first place; and further, because, as to all the respondents, and particularly as to the supplemental or new respondents,

Will v. Tornabells & Co.

they were all, as claimed, innocent purchasers or lienors of the portions of the property they had acquired in good faith, for full value, and without notice, because no warning or cautionary notice of the pendency of the suit had been filed in the registry of property, as, it was claimed, was required by law.

The court overruled this motion to dismiss and called upon the respondents for their proofs, but, save as to a formal matter or two by some of them, they all declined to introduce any proofs, choosing to stand on the several grounds of their motion to dismiss. Whereupon the court announced that its denial of their motion to dismiss was no indication that we were satisfied that a decree ought to be entered for complainants, but that we would fix a time within which all counsel might file briefs in that behalf. Within about sixty days after that time, elaborate briefs and written arguments, some of them forty or fifty pages long, were filed by nearly all the counsel. The stenographer's notes of the evidence have all been written out, the exhibits have been arranged, we have read all the testimony, the briefs, and arguments, and have examined the exhibits, besides many of the authorities to which we were referred. With our recollection thus refreshed, the matter is before us for final determination.

The original bill was filed, and counsel for complainants acted thereunder through all the years of the proceeding, on the theory that the ancient chancery rule of *lis pendens* obtains in this court in this island, and therefore complainants did not, at any time during the course of the proceeding, file in the registry of property any cautionary or warning notice of the pendency of the suit, as required by the local mortgage law, assuming that the old chancery rule said to obtain in courts of the United States in the States was sufficient in that regard to

III. PORTO RICO—9.

bind all the property described in the bill, and that all persons purchasing or taking liens upon any portion of the same after the filing of the bill, and the service of process under it, did so at their peril and subject to complainants' rights.

On May 27th, less than a month ago, the Supreme Court of the United States rendered its decision in the case of Romeu v. Todd, 206 U. S. 358, 51 L. ed. 1093, 27 Sup. Ct. Rep. 724, which went up from this court some two years ago, and in and by such decision, it is claimed, declared the chancery rule of *lis pendens* not to be in force in Porto Rico at all, because of the character of the court and the peculiar terms of the Foraker law or organic act (31 Stat. at L. 77, chap. 191). We will also have occasion to refer to this contention later on in this opinion.

From the bill, as finally settled, and the several answers, as well as from the vast bundles of other pleadings that have crept into the case, and from the exhibits and the hearings had before us, we have in a measure learned the facts of the case, and as it will not be possible to intelligently consider or understand the issues involved without setting them forth, we state them to be substantially as follows:

For many years previous to the year 1900, Joaquin Tornabells and Carlos Doitteau had been doing an immense business as merchants, traders, coffee planters, and dealers, at the city of Mayaguez, on this island, and, to that end, possessed and owned large stocks of goods and many buildings, warehouses, plantations, plants, machinery, etc. It developed in the cause that some year or so previous to that time, this firm, being in embarrassed circumstances owing to the devastating effects of the great hurricane of 1899, which impoverished so many coffee planters and merchants on the island, under a local statute permitting such a proceeding, went into the courts and obtained a

Will v. Tornabells & Co.

suspension of payments of their debts for a three-year term, the same to be paid in installments in some manner agreed upon at a meeting of their creditors, as was provided under that law. This fact in their circumstances was presumably well known in that community. While they were thus living under the protection of this suspension of payments, and on the 2d day of May in the year A. D. 1900, the firm, by a duly executed public instrument, transferred what is contended was practically all of its property, although this fact as to its being anywhere near all the firm's property is not admitted by respondents, on what evidence we do not know. Said property consisted of its place of business and other town property, its stock of merchandise, and twenty-six several pieces of real estate, most of them being coffee plantations and their appurtenances, to the respondent Luis Aran y Lanci for an alleged consideration of 197,700 pesos, provincial money, 30,000 pesos of which was stated in the transfer to have been paid in cash at the time of the sale, and the balance to run in all for ten years, to be paid at the rate of 16,700 pesos, provincial money, per annum, without interest. These twenty-six pieces of property are each particularly numbered and described in an extensive exhibit to the bill.

Nine days later, on May 11, 1900, this vendee, Luis Aran y Lanci, mortgaged fourteen of the twenty-six parcels of real estate, under proper description and number, to the respondent Baudilio Duran y Cat, as an individual, but who, as stated, never was served with process in this cause, to secure unto him an alleged indebtedness of 130,000 pesos, provincial money, with interest at the rate of 6 per cent per annum thereon, Aran giving to his said vendee his ten negotiable promissory notes in that behalf, so secured, running from one to ten years respectively, for the sum of 13,000 pesos each; and in the same instru-

ment also mortgaged to the said same respondent's firm of Duran & Coll, who were also a firm of merchants doing a large business at said Mayaguez, five additional parcels of said real estate, all also as numbered and described, to secure an alleged pre-existing indebtedness of 20,000 pesos, provincial money, with interest from said date at the rate of 9 per cent per annum thereon. The said firm of Duran & Coll a month and a half thereafter, on the 25th day of June in the year 1900, remortgaged or assigned their said alleged mortgage interest to the respondent Raimundo Valdecillo to secure an alleged indebtedness of theirs to him of 6,000 pesos, provincial money. Every one of which transfers complainants allege were made without consideration of any kind, with intent to hinder, delay, and defraud complainants and other creditors of the said firm of J. Tornabells & Company, no consideration at all, as alleged, having passed between the respondent Luis Aran y Lanci and the respondent firm of J. Tornabells & Company for the first transfer and none from the said respondent Baudilio Duran y Cat to the said Luis Aran y Lanci for the largest part of the second transfer, and none between the said firm of Duran & Coll and the said Aran for the second part of said second transfer; and that if any consideration passed between the said Valdecillo and the said firm of Duran & Coll for the said re-mortgaging, assignment, or third partial transfer, it was with full notice of complainants' rights, and therefore unavailing as against them.

Complainants further allege that this whole transaction was a subterfuge and fraud, and that in truth and in fact a secret trust existed between the parties, by which the property in reality remained with the respondents J. Tornabells & Company, and that they continued thereafter to collect the money from, use, enjoy, and dispose of said property or its proceeds,

just the same as before. This is strenuously denied by all respondents.

These transfers, which are alleged to have been without consideration and in fraud of creditors, were filed in the proper public registry offices for the filing of titles to land, within a short time of the execution of each of the same respectively, that is to say, the one from J. Tornabells & Company, to respondent Luis Aran on the 31st day of August, 1900; the joint mortgage from Aran to respondents Baudilio Duran individually and Duran & Coll as a firm on the 16th day of May, 1900; and the reassignment .from Duran & Coll to Valdecillo on the 5th day of July, 1900. As to whether or not the respondent Luis Aran y Lanci took immediate possession of the place of business and of these plantations on the execution of the deed from Tornabells & Company to him is disputed on the evidence, but the weight of it would seem to be that he did, even though it is probably true that Tornabells & Company contined thereafter to remain around their old place of business, settling up their affairs, if not actually in regular business.

However, on the 13th day of September, 1901, one year and four months after the date of the main transfer, the respondent firm of J. Tornabells & Company executed before a notary, a public instrument which was duly filed in the registery of property and is in evidence, by which they acknowledged complete payment to them by said Luis Aran y Lanci of the balance of 167,700 pesos, provincial money, due them, thus pretending at least to clear off the entire property to the respondent Aran y Lanci, and necessarily making his meantime mortgage thereof to the other respondents, Baudilio Duran y Cat and the latter's firm of Duran & Coll, presumably completely good, in so far as the registry of property would show.

Will v. Tornabells & ·Co.

It also transpires that none of these original complainants, or any other complainant who joined them thereafter, had, at the time of the making of this original alleged fraudulent transfer, any judgment against the said J. Tornabells & Company, and none of them recovered any such judgment for more than a year thereafter, and most of them much later, some as late as three years, and the said transfer thus originally made was not in fact attacked by anyone for more than two years and one month after the making of the same, to wit, on June 23, 1902, when the original bill in this cause was filed, alleging these several frauds, and during which period no cautionary notice of any sort or kind was filed in the registry of property.

On the 18th day of June, 1902, the new respondent, the Banco de Soler, took a mortgage upon one of the properties mentioned in the original bill, that is called Porvenir, but did not get its said mortgage to the registry until the 5th day of July, 1902, which was a day or two after the service of process upon all of the original necessary respondents in the case. This firm strongly protests that it is an innocent lienor for value without notice. That it took its mortgage after a thorough search of the records and after having seen respondent Aran in unmolested possession of, and dealing with, it for years, etc.

Also the new respondents, Fritze, Lundt, & Company, Sucesores, and Fritze, Lundt, & Company in liquidation, took a mortgage upon two of the estates concerned in this original bill, known as Paz and Atalaya, but they did not get the same of record until the 7th of January, 1903, some six and a half months after the filing of the bill. They in like manner insist that they are innocent lienors for value without notice, and that because no cautionary notice under the mortgage law was on file, and Aran was for several years in peaceable possession of, and

dealing with, the property, having good recorded title thereto, complainants can have no cause of action against them.

The new or supplemental respondents, M. Martinez & Company, Carmen Rita Surriñach, Ricardo Surriñach, Camilo Surriñach, and María A. Surriñach, Ursula Vidal, Vda. de Dominguez, Santiago Saenz, Adolfo Ramirez de Arellano y Lugo, Alfredo Ramirez de Arellano y Rossell, Quintin Ramirez y Ramirez, Pedro Aran y Cuascu, and the American Trading Company, all either bought portions of the property involved, or took liens upon the same, or bought some of the outstanding Baudilio Duran y Cat 13,000-peso negotiable promissory notes, secured by the mortgage given on some of the property; but all these persons became interested long after the filing of the original bill, and some of them as late as 1905 and 1906. They all claim to be innocent purchasers for value without notice, and that, in the absence of a cautionary notice after the filing of the bill, and because of seeing Aran and his vendees in peaceable possession of the property and dealing with it for several years, as aforesaid, with good recorded title, they are free from liability in the premises under the mortgage law of the island, and as laid down in the recent decision of the Supreme Court of the United States in Romeu v. Todd, aforesaid.

This bill itself was not under oath; it was presented as a set of allegations, merely signed by counsel, and an answer under oath to it was waived. Notwithstanding this waiver, after a good deal of dilatory pleading and delay about it, an answer by J. Tornabells & Company signed by Doitteau was put in under oath on October 3, 1904, to have effect as of date of October 6, 1902, the delay occurring for lack of signature to the first one, the same date that a similar one sworn to by himself and another sworn to by Tornabells had been filed.

Will v. Tornabells & Co.

These answers admit the making of the original transfer by and to the original respondents, as set up in the bill, but emphatically deny each and every allegation of fraud or evil intent with reference thereto, and insist that the transfers were in each instance made for full value, and for actual cash or its equivalent, or to pay debts, as set out in each of the instruments referred to, and that the money realized by respondents J. Tornabells & Company was duly used in the ordinary course of the liquidation of their affairs and in the payment of their debts honestly and properly in every way, and that Tornabells & Company retained no secret interest or benefit in the said property, or any portion thereof, after the transfer to Aran, and did not remain in possession or control of the same; and assert that Tornabells & Company's receipt given to Aran for the large balance of the purchase money, a little more than a year after the making of the principal transfer, was made in good faith because of the transfer therein referred to, and the receipt of the money or its equivalent, less the discount in said receipt set out.

On October 2, 1905, and by leave again in September, 1906, the widow of Tornabells, representing herself and her said then deceased husband and his other heirs, and also representing her husband's then deceased partner, Carlos Doitteau, filed an amended answer, adopting and restating all former answers, and again, with much more particularity, denying all fraud, and alleging in detail good faith as to every one of the transactions, and setting out at length the mode of payment by Aran to her said husband's firm, J. Tornabells & Company, for the vast estate which the firm had transferred to the former, and following her husband in asserting that the price for which the estate was sold was the reasonable and fair value of the same at the

time. She repeated, as her husband did, that 30,000 provincial pesos were paid in cash at the time of the transfer. That $17,-156.92 were paid by said Luis Aran on June 29th, 1901, which was made up of a series of credits totaled and entered up in favor of said Aran by Tornabells & Company, on account of various sums of money which said Aran had furnished the firm at various times up to that date. That there then remained due a balance of $96,031.08, which was thereafter satisfied and discharged as follows: A credit was given to Aran of $38,779.33 on account of a discount for immediate payment of the deferred payments which ran for ten years into the future at the rate of 16,700 pesos per annum, without interest; that another credit of $6,799.54 was also totaled and entered up in favor of Aran, as detailed in the books of the firm, up to September 13, 1901, on account of various small sums paid by him, or which he became entitled to credit for. That on the 13th day of December, 1901, there remained a balance due by the said Luis Aran to Tornabells & Company on account of the said purchase money, of $50,452.21, and that upon said date there was paid in cash by the said Aran to J. Tornabells & Company the sum of $45,639.40, leaving a balance of only $4,812.81 due on that date, which was thereafter satisfied by various sums paid from September 26, 1901, until April 1, 1902, all as appears by the detailed accounts thereof kept by the said Luis Aran with J. Tornabells & Company, and *vice versa*. That these payments were the reason for the giving of the final receipt by J. Tornabells & Company to respondent Aran on September 13, 1901, and that the same was true in fact as to final payment in every sense. She also denies emphatically that her husband's said firm was insolvent, even though in suspension of payments in 1900 at the date of the making of the transfers. Then her an-

swer proceeds, reiterating, supplementing, and approving the previous sworn answers of her said husband of October 6, 1902, and the answers of his counsel of October 2, 1905.

Also in September, 1906, the widow of the respondent Luis Aran y Lanci filed her amended answer as representative of herself and her said husband's heirs, and she corroborates in detail the said final answer filed by Tornabells' widow as afore- said, and with equal emphasis denies each and every allegation of fraud, and alleges the best of good faith, and that reasonable and full value was given and received as to all the transactions. In addition, she denies that the mortgage to Baudilio Duran and Duran & Coll was in any sense pretended or fraudulent, but alleges the good faith of the same for full value received in each instance, and she gives in detail several transactions between Duran & Coll and Tornabells & Company and her husband, Aran, in the nature of accommodations to each other, that go to some extent in explanation of some of the transactions between those persons referred to in these proceedings.

Both of these widows in their above referred to answers give details as to the creation of the debts claimed to be due to complainants herein, but the widow Aran, in still another amended answer, filed by leave as recently as February 2, 1907, pleads the statute of limitations of one year against the filing of the bill in the first place, and then sets up, for what it may be worth, the alleged fact that the debt due to complainants Alberto Will & Company, was based upon accommodation drafts of Schulze & Company, a neighboring mercantile firm of Mayaguez, on which J. Tornabells & Company were mere accommodation indorsers, and which had been drawn in the month of April, 1898. She alleges that Schulze & Company was the principal payor of

the same, and that in May, 1900, at the time of the transfer com-
plained of, no liability of the said J. Tornabells & Company had
been determined by any suit or judgment against either said
Schulze & Company or Tornabells & Company, on such commer-
cial transaction, and that no judgment was rendered against J.
Tornabells & Company thereon until April, 1902, some two
years after the transfer complained of here. She further al-
leges that as to the claim of David Midgley & Sons, it was based
on a general indebtedness of £1,160 for merchandise sold by
them to the respondents Tornabells & Company on the 1st of
January, 1901, or some eight months after the transfer com-
plained of, and several months after it had been recorded; and,
further, she contended, for what it may be worth, that said firm
therefore did not extend the credit to her husband's firm on the
strength or faith of that firm's ownership of any of the prop-
erty which had theretofore been transferred by it. She further
alleges that no judgment was obtained upon such claim until
April 22, 1902, or practically two years after the transfer com-
plained of. She further alleges as to the claim of complainants
Ramon Cortada & Company, that it was based upon a general
indebtedness of $3,480 of August 14, 1900, but whether created
on that date or not is not stated; that it was for merchandise
purchased by Tornabells & Company and that no judgment was
obtained on account of the same until the 21st day of January,
1902, or more than a year and a half after the transfer com-
plained of. She further states that, as to the claim of L. W.
& P. Armstrong, no judgment has ever been obtained upon the
same against Tornabells & Company, and that the same remains
to this day simply a general indebtedness, amounting to $8,473.-
54, as recognized by J. Tornabells & Company, on the 8th of
December, 1899, but that said L. W. & P. Armstrong never, at

any time before or since the transfer complained of, obtained any lien of any sort on the property of J. Tornabells & Company to secure the same.

In the original bill and several other of the pleadings it was alleged that respondent Luis Aran was not in the island of Porto Rico at the time of the transfer to him of the property in question, and that he was represented in such transfers by the respondent Alfredo Saliva. The latter denies this in his own answer filed October 6, 1902, and practically all the other answers make a similar denial thereof, and no proof at all competent was introduced in denial of the assertion of the notary who drew the original transfer that Aran was then in fact present in person.

On October 6, 1902, the respondent Juan Coll y Soler, one of the mercantile firm of Duran & Coll and a partner of Baudilio Duran, who, it is claimed, is the figurehead in the big mortgage received from Aran, filed, through his solicitors, an answer setting up the bona fides of the entire transaction as to Duran & Coll, and asserting that the debt of 20,000 pesos was due his said firm from respondents J. Tornabells & Company, and that Aran assumed it through the medium of the mortgage because of his indebtedness to said firm; that thereafter a portion of said debt was paid to them by Tornabells himself on account of Aran, but counsel for respondents claim this is explained by the evidence of witness Koberg and others, and the exhibits, the same occurring naturally and honestly, as it is claimed, in the ordinary course of business between J. Tornabells & Company and Aran after the transfer complained of, but Coll's answer shows that the unpaid balance of his firm's debt is still due. Coll's answer further shows that his firm's transfer to Valdecillo of a portion of its said mortgage as security was made in the

best of faith and for a valuable consideration, without any fraud of any kind.

Respondent the American Trading Company, which is a holder of one of the indorsed 13,000-peso notes from Luis Aran to Baudilio Duran, files an answer on January 31, 1907, and sets up the facts as heretofore stated, and that the note it holds was indorsed by Baudilio Duran, the original payee, to one Martin Serra, which latter person transferred it to the said American Trading Company for a debt due the latter by the son-in-law of said Serra, one Palau, which said Serra chose to pay for his relative, and that it is now the owner of said still unpaid note so secured by said mortgage, without notice of any proceedings herein, and that because the mortgage antedates this suit, and none of the transfers were attacked within a year, and because no cautionary notice was filed in the registry of property, complainants can have no cause of action against this particular respondent, etc. This same respondent then sets up a cross bill praying the court to foreclose the mortgage and have its money paid to it, but the court held the same in abeyance, and it has not been pleaded to, on the ground that this sort of affirmative relief between respondents cannot be obtained in this class of action.

At the hearing, counsel for complainants introduced in evidence in the way of exhibits, immense transcripts from the registry of property, showing all of the principal transfers above referred to. Naturally these papers are immense as to size and contents because of the detail that is customary in a Spanish deed or mortgage, such as showing how much of the debt and the possible costs each piece of land, as described, shall be liable for, and how particular pieces can be released on the payment of particular portions of the debt, etc., and because of the pecul-

iar provisions of the immense Baudilio Duran mortgage, se-
curing the ten 13,000-peso notes, etc. These records, of course,
purport to show the acknowledgment of the receipt of the origi-
nal cash-down payment of 30-000 pesos and of the final payment
of the balance of the entire 197,700 pesos purchase price by Aran
to Tornabells.

If the contention that is insisted on by counsel for complain-
ants with reference to the status of the pleadings is to prevail,
then this is practically all the evidence there is in the case, and
the court is forced to do its guessing from the largely unproved
and unsworn-to allegations of the bill, and the scraps of compe-
tent testimony introduced at the hearing. It is contended that,
because the bill is not sworn to and respondents did what would
be called at law demurring to the evidence, that is, rested at the
end of complainant's case, and refused to proceed further, that
then even though Tornabells, Doitteau, and Aran have their own
sworn answers in, and their widows later filed specific answers,
the same cannot be considered for any purpose, because not sup-
ported by oral proof, and that this condition of things simply
obliges complainants to prove the several statements of their bill
by one witness only in each instance. Complainants contend
that they have done this, particularly if the evidence of one of
their counsel, Mr. Cornwell, is admissible, and that in any event,
even without Mr. Cornwell's evidence, the exhibits and the other
scraps of testimony make such a case of circumstancial evidence
of fraud, and throw such suspicion on the respondents, that the
court is bound to enter a decree for complainants.

It is not often that such a condition of the pleadings arises.
Usually a hearing in chancery goes out to a referee or master
and he takes all the proofs, makes his findings of fact or law or
both, as the case may be, and reports to the court. To be frank

Will v. Tornabells & Co.

about it, we see no reason in theory and we are not familiar with any rule or authority, nor have we been cited to any, that would deny to these respondents in this suit in equity, any more than if the same were a suit at law, the right to rest at the end of complainants' case and refuse to introduce any testimony in support of their answers or any other denial of the allegations of the bill, if they believe, as they say they do, that no case has in law or in fact been made against them. It might be stated here in justification of counsel that they claim this "stand-pat" action of theirs is taken not from any desire to hide a fraud, but because they honestly are of the opinion that complainants have not made a prima facie case, and moreover are guilty of inexcusable delay in and about the prosecution of their suit for so many years, and because, since the filing of this suit, the original debtors, Joaquin Tornabells and Carlos Doitteau, as well as the original transferees, Luis Aran y Lanci and Baudilio Duran y Cat, have all died, and that the books of both the original respondents in the hands of the widows or the liquidators are quite as accessible to a *subpœna duces tecum* at the request of complainants as they are to respondents, even though it should transpire that there is nobody alive or obtainable who has intimate knowledge of the contents of such books or who could explain them on the stand. Without commenting on the sufficiency of this excuse under the peculiar circumstances of the case, we desire to state, with reference to the testimony introduced by complainants, that it is indeed meagre and in the extreme unsatisfactory. In fact, during the hearing we at times were annoyed at the very evident appearance of fear or evasion shown by the witnesses called, and at other times felt a sort of sympathy for complainants in their efforts to bring out the truth, as we thought, against every obstacle that could be put in their way.

### Will v. Tornabells & Co.

This belief was strengthened when we noticed that several important witnesses were unaccountably absent, and several others, instead of responding to process, sent in physician's certificates alleging their inability to be present. In spite of this feeling, a thorough examination of the record and the cold law, in the light of all the surrounding circumstances, has driven us back to a consideration of the whole case from as impartial a point of view as we are capable of.

Complainants called about a dozen witnesses in all in an effort to show that Baudilio Duran, the person to whom Aran gave the large mortgage, never had anything to do with the transaction except to permit his name to be used, and to indorse the ten 13,000-pesos notes and give them back to Aran, who, it is contended, at once gave them to Tornabells, the latter presumably using them in and about the satisfying of his creditors just as he would use mortgage bonds. It appears that this sort of note is something well known to the Spanish law, and that they are called "vales hipotecarios." To tell the truth, complainants manifestly failed in their proofs in this regard. Their testimony is so piecemeal and so uncertain, even when drawn from the witnesses introduced by a cross-examination by counsel for complainants who introduced them, and is, as and of itself, so unsatisfactory as a basis for asking a court to disturb such a vast amount of titles, as to make us falter at the proposition, while at the same time it leaves in our mind an unsatisfied feeling as to the honesty of the transactions and the good faith of respondents.

Counsel for respondents, in their oral arguments and in their briefs, become almost bitter in their objection to the attitude of Mr. Cornwell, one of the counsel for complainants, for testifying at all in the cause, and against the admissibility of his

Will v. Tornabells & Co.

evidence. Assuming, as we do, as Mr. Cornwell is an intelligent and an honorable man, that he firmly believes his position to be right, and that he honestly believes the communications of Tornabells to him are not privileged because the same were a request for advice as to how to commit a fraud, as to which proposition of law Mr. Cornwell, we believe, is surely right,—then that being true, it is not only his privilege, but his duty, to disclose the facts to the court. We say this notwithstanding the comments of opposing counsel as to the indelicacy of his position because of his being now on the opposite side of the issue that arose as a consequence of the communication he testifies about, and is interested in the cause to the extent of a large contingent fee, as he confesses.

The purport of Mr. Cornwell's evidence is that he had been, for several years previous to the making of the transfer complained of, general counsel for the large mercantile house of Tornabells & Company, and very friendly with the members of the firm; that about two months before the transfer complained of was made, Tornabells and Doitteau, the two members of the firm, accompanied by the French consul, a friend of theirs, but without Aran being present, called at his office and unfolded a "scheme" whereby they intended to place the assets of the firm beyond the reach of creditors, etc.; that Aran was not mentioned in this "scheme;" that he told them it "was not straight," and advised them to go into bankruptcy; that he could not represent them in anything of that sort, etc.; that they knew at this time he represented some of the complaining creditors and others; that then they left, nothing further being said about the matter, but that, before leaving, Tornabells confessed that he had no intention of ultimately defrauding any of his creditors, etc., that in about two months thereafter the transfer in question was

III. PORTO RICO—10.

made and shortly thereafter appeared of record; that he spoke to them several times after the transfer was made, and that they virtually acknowledged all about it, etc. It further appears that Mr. Cornwell and his firm continued to represent this firm thereafter in many suits and proceedings which he contends had all been begun before the incident here mentioned, and it is in evidence that when Cornewell's firm afterwards brought suit for one of the complainants in this case on the law side of this court against Tornabells, that the latter came into Cornwell's office and signed a confession of judgment thereon, which was there prepared for him, and that this occurred more than a year after the making of the transfer complained of.

A most careful reading and rereading of Mr. Cornwell's evidence is unsatisfactory to our mind, on the point that he was in fact justified in assuming that Tornabells & Company really wanted to do anything that could be justly characterized as any such fraud as was at that time prohibited by the laws of Porto Rico, or that he desired to make any disposition of the firm's property that he did not have full right to make at that time, or that would take his communication to Cornwell out of the well-known line of privilege in such cases between attorney and client, for Tornabells, in our opinion, on the facts, much as we regret to disagree with Mr. Cornwell, undoubtedly consulted him in his professional capacity as an attorney, even though the French consul was present at the time, he being such an intimate friend as that he could not, in our opinion, be held to be a stranger in the sense of the rule. Therefore we have grave doubts whether Mr. Cornwell's statement ought to be received at this time, because it is the admission of a dead man against the interest of his own heirs, and the same rule is, we think, applicable as to Mr. Cornwell's evidence with reference to Aran.

Will v. Tornabells & Co.

Furthermore, on mature reflection, we think that that portion of his evidence telling how the widow of Tornabells recently came into his office and endeavored to make some contract with his firm to furnish evidence for their use, of this fraud, in consideration of getting some of the property to be recovered for herself, which he refused to consider unless she would bring some business man with her to be a witness to it, ought not to be admitted, because it is at best but a statement by a third party intended to impugn after the fact, the bona fides of a transfer, the parties to which are now all dead. At most it is but hearsay, and she, being a living witness and present in the town at the time, might easily have been put on the stand herself even by complainants, if her testimony could be received at all, of which we have grave doubts.

Therefore, if the mere unsworn allegations of the bill are not evidence, and if the sworn answers and the unsworn answers in all their detail cannot be received as evidence in the absence of proof to substantiate them, it would seem as though there was nothing in the case in the way of receivable proof but the few admissions of the several answers and the exhibits from the public records and deeds, and the few scraps of unsatisfactory testimony from a few of the many other immaterial witnesses introduced, and this is the sort of record we are seriously asked to consider sufficient to warrant us in depriving several persons of a hundred thousand dollars worth of property. We say this notwithstanding the fact that we have, as stated, from our examination of the demeanor of the witnesses, an abiding conviction that they were either, as a whole, uncommonly stupid, or were making a deliberate effort to hide some facts they ought to have known; but the court is not here to deprive people of their property or property rights without due process of law,

and no chancellor, however conscientious, can depart from the unswerving rule that upon the plaintiff or complainant in every case is imposed the burden of proving the allegations he makes, and that when proved they must entitle him to the relief he asks for. A chancellor's conscience abhors guessing at facts as much as it abhors fraud itself; and when proof is lacking, he should suffer upon whom the law imposes the duty of presenting it.

While stating this, we admit that there are many cases, especially in equity, where, after a prima facie case has first been made by complainants, and where surrounding circumstances throw suspicion upon the acts of respondents, in which many presumptions are properly indulged against them. Especially is this the case when respondents fail to remove such suspicions when the proofs show that it is probably easily in their power to do so. See Kirby v. Tallmadge, 160 U. S. 379, 40 L. ed. 463, 16 Sup. Ct. Rep. 349. In the case at bar we have the gravest doubts that a sufficient prima facie case has in fact or in law been made against the respondents. Our hesitation in this regard is increased because of the great probability that the property was in fact paid for in the manner set out above and the money used in paying the firm's debts.

Judge Pettingill, of counsel for complainants, as we gather from his uncommonly able and exhaustive principal brief, seems to have a full appreciation of the existence of good cause for this hesitation on our part, and hence he devotes a considerable portion of his effort to pointing out to us in detail what he considers to be five badges of fraud in the case, which he claims have been duly proved, and which he contends of themselves raise such suspicions and presumptions as that, even in the absence of Mr. Cornwell's evidence, they make a prima facie case

that should at least have forced respondents to a defense, in the absence of which, complainants ought to be entitled to a decree.

It would be unfair to counsel not to consider the points he thus makes. To state them succinctly, as the first badge of fraud, he points out that the transfer complained of was an alleged sale of practically all of Tornabells & Company's assets, while deeply indebted and probably insolvent, and that it was made on long time, without any security, which was supplemented in a few months by Duran, a cousin of Tornabells, injecting himself into the equation, and becoming the conduit for the passage and commercial floating of the ten large negotiable promissory notes; and he further points out that this whole transaction, involving nearly $200,000 pesos, was carried on apparently without the intervention of any bank or other outside person having anything to do with it. While we admit that the import of the whole case is that the transfer was of practically all of Tornabell's property, there is really no positive evidence on that subject, and counsel for respondents—based upon what, we do not know, unless on matter outside the record, from the suspension of payments proceedings—contend that the firm had a vast additional amount of property remaining at that time, which they continued in liquidation of for several years thereafter. And as to there being no intervening outsider or banker, that appears to be possible because of conditions at the time in the island just after American occupation, and because of the sort of transaction consisting of partial payments, swapping of accounts, etc. It must not be forgotten that even the exhibits introduced by complainants show the receipt by Tornabells of these 197,700 pesos in detail, less the discount allowed. With all due respect, we contend that no satisfactory proof that this payment was not made has been introduced, and the duty and

the burden to do so was upon complainants, as they alleged no consideration at all passed for the transfer.

The second badge of fraud is alleged to be the failure to apply the consideration received for the property to the payment of any of the debts of the partnership. We do not think this is a fair presumption from even the scanty evidence before us, for we do think it shows, if it shows anything, that every dollar of that money was applied in some way to pay the debts of the partnership. And in this connection we might refer to Mr. Cornwell's statement that the widow of Tornabells, when she called on him, said that she and her children were almost in poverty and distress. Let us not forget that, according to what evidence there is, more than half the consideration paid by Aran was in small sums and in payment of debts of J. Tornabells & Company. This is in evidence quite as much and with equal force as the allegation that no consideration at all was paid. No other creditors than these complainants are here protesting that they have not been paid, and none of them forced the concern into bankruptcy.

The third alleged badge of fraud is that the consideration, though alleged to be an amount equal to the full value of the property, complainants claim that no consideration in fact passed. With all due respect, we cannot admit that the proofs show any such thing. Nor can we see how such a claim on the part of complainants can of itself be a badge of fraud. The original deed shows the receipt of 30,000 pesos, and the receipt filed in the recorder's office some months later shows a receipt of $45,000 in cash and other large sums made up of credits to which Aran became entitled, and not one word of this has been denied by proof of any kind, and the evidence said to throw suspicion on it, in our opinion, tends as much to establish its truth

Will v. Tornabells & Co.

as its falsity, and this without giving any weight to the sworn answers of the original respondents.

The fourth alleged badge of fraud is that both Tornabells and Aran had possession of, and used, the mortgage notes which, if given at all, were given by Aran, their payor, and should have been in possession of, and used by, Duran, who was the payee. We admit that there is some testimony on this point, but after reading it over more than twice, carefully, we fail to find that it is sufficient to show that Tornabells in fact remained in possession of the notes, and it fails utterly to show that he remained in possession of the property. In looking at such a matter as this, one has to take surrounding circumstances into consideration; that is, the relation and friendship of the parties, their mutual aid, their situation in a small town, the distressed condition of things after the hurricane and the war, and the present situation of the property in the hands of the vendees and lienors of Aran, and the fact that the deed is absolute on its face, and there is no evidence showing that Aran himself ever for a moment acknowledged to anyone that any secret trust existed in favor of Tornabells or his family; and it is, we think, unquestioned that some of the Duran notes are now in the hands of third parties, assigned for a debt that was not Tornabell's. We admit that there is a lot of evidence of a very unsatisfactory character as to where these notes were found at times, and what they were used for, and how some of the property was relieved from their effect and mortgaged to others, but every witness that was introduced, notwithstanding the peculiar character of his evidence, claimed to have paid value for the notes when received, and these, it must be remembered, were complainants' own witnesses, who proved to be adverse; but this does not, in our opinion, relieve complainants from the burden that is on them and

remains with them all through the case, to prove their allega-
tions in this regard. One witness introduced by complainants
did testify rather positively about Tornabells using one of these
notes, but it was drawn out on cross-examination that he is the
representative of one of the complainants and largely interested
in the result of the suit, and, to tell the truth, we must confess
that his story was rather improbable and did not impress the
court as any too exact, and we would be unwilling to deprive
anybody of his title on his statement.

The fifth badge of fraud is somewhat of a repetition and is al-
leged to be that the property pretended to be sold always re-
mained in possession of the vendor Tornabells. This allegation
must be the result of the impression made on counsel's own mind
by what he expected to prove, because, as stated, we do not think
that has been proved. On the contrary, the evidence tends to
show that the property has been since the day of the sale, and
is now, in possession of Aran or his vendees or mortgagees, or
was until the receiver took it away from him or them. On this
subject of possession we might state that we wholly discard the
evidence of the witness Rivera as unworthy of belief, either pro
or con. This was a witness who had been brought to the of-
fice of counsel for complainants some week or so before the
hearing by old lady Tornabells to show the possession in her
husband after the transfer, when she expected to make a bargain
to furnish the evidence of the fraud. Notes were taken of what
he would testify to, but when put on the stand he testified to the
direct opposite, and then proof was made of his former state-
ments.

Now let us consider another phase of the case. There is not
now and never was any such statute in Porto Rico as the stat-
ute of 13th Elizabeth, in England, referring to fraudulent con-

Will v. Tornabells & Co.

veyances, because we have the civil-law rule here instead of the common law. Every state in the Union has a re-enactment of this statute of Elizabeth in some form or other among its laws. See 14 Am. & Eng. Enc. Law, 2d ed. p. 223. In the absence of it, there is no rule of law preventing a debtor, even when insolvent,—for even that does not take from him the power of disposition of his property,—from doing about what he pleases with his property, and paying his debts with it or a portion of his debts, and preferring one or more of his creditors with absolute intent to hinder, delay, or even to defeat other creditors. If the favored creditor receives no more than is due him, and permits the debtor to secure no advantage to himself, the transaction will be upheld. Id. pp. 225, 226, text and notes. McClellan v. Pyeatt, 14 C. C. A. 140, 32 U. S. App. 104, 66 Fed. 843; Crawford v. Neal, 144 U. S. 595, 36 L. ed. 557, 12 Sup. Ct. Rep. 759.

As stated, the time of this transaction was just after the geat hurricane of 1899, which devastated the island of Porto Rico and reduced coffee merchants to such straits that all their neighboring merchants and the wholesale men, who were carrying them, appreciated their condition and endeavored to help them along by extensions of time. Merchants here were not used to such things as creditors' bills. No court of chancery was known to them before American occupation, and this fact is important when we attempt to determine what was the intent of the respondents in this transaction.

Tornabells & Company had themselves already secured a suspension of payments through the local courts, and it was natural that they should make some effort to realize from their property with a view to paying some portion or the whole of their debts. We cannot see why they did not have the right to

do this, and to prefer any creditor they saw fit to prefer, and why creditors did not have the right to exercise diligence in securing their debts from them in any way they could. We cannot see why J. Tornabells & Company could not have done all that is alleged in the way of transferring to Aran, and the latter mortgaging to Duran so as to get secured notes to use. There was nothing wrong about that unless Tornabells & Company kept or reserved some benefit to themselves. If it was simply a unique system of banking, there was nothing wrong about it; and if the notes were to be spread broadcast for value, or given to particular creditors, and the property that backed them was effectually lost without privilege of redemption to J. Tornabells & Company, we are wholly unable to see what was illegal about it, or how it can be attacked save in bankruptcy proceedings.

Let us suppose that Tornabells & Company, instead of selling their property to Aran, had directly themselves issued their own notes secured by all this property, and had sold these notes in the open market just like bonds. What would have been wrong about the transaction? After the sale of the notes, attacking creditors at most could only go after the equity of redemption. They could not set the transaction aside, nor embarrass the holders of the notes in any way; and if the property was all eaten up in payment of the notes, that would be the end of it. Now how is this case materially different from that sort of case? That is why, in the light of the evidence of the actual payment by Aran for this property, we are unwilling to disturb the titles of so many people, on a mere suspicion that Tornabells & Company may have had some secret understanding with Aran and Duran.

We do not know that it ought to be wondered at that these

witnesses, holding these notes or this property, were timid and loth about testifying, through fear of losing the property they may have bought in the best of faith.

We can well see that respondents may be embarrassed about boldly setting this up, because the pleadings have got into such mixed condition after this long delay, owing to complainants' failure to timely begin or diligently prosecute their suit until after the death of all the original respondents, as that they cannot show this as the true state of facts. Respondents were put to a decided disadvantage as to making their proofs and have some justification for resting their case flatly on the ground that complainants have not shown themselves entitled to any relief whatsoever against them.

In the state of Alabama, a debtor has a right to prefer a creditor, and it was held by the Supreme Court of the United States in the case of Bamberger v. Schoolfield, 160 U. S. 150, 40 L. ed. 376, 16 Sup. Ct. Rep. 225, appealed from that state, that when a sale is made to a creditor for a fair price to extinguish the debt, and it contains no reservation or interest or benefit to the vendor, it is a valid transaction even though the vendor was insolvent at the time and the vendee knew that fact, and further knew that the vendor had a fraudulent intent to defraud his other creditors by the preference when the sale was made. And that case further holds a point which we consider of great weight here, that when, in such a case, it is contended that the trade was simulated, and that there was a secret trust or benefit reserved to the debtor, the burden is on the contesting creditor to establish it. Respondents contend that, in the case at bar, complainants must show the secret trust and the reservation in favor of Tornabells, and that they have utterly failed so to do. We command counsel to a reading of

the case last cited, because, in our opinion, the facts in it were decidedly more in favor of complainants than are the facts as proved in the case at bar.

In the case of Horbach v. Hill, 112 U. S. 149, 28 L. ed. 672, 5 Sup. Ct. Rep. 81, the Supreme Court holds that a debtor has a right to dispose of his property in the ordinary course of business for a valuable consideration and the defendant has a right to purchase it, and complainant must show that he was a creditor at the time or he cannot complain. It further holds that even a voluntary conveyance, that is, a gift, is good as against subsequent creditors unless executed as a cover for future schemes of fraud.

In the case of Davis y. Schwartz, 155 U. S. 631, 39 L. ed. 289, 15 Sup. Ct. Rep. 237, it was held that in the state of Iowa a creditor may make a mortgage or other conveyance of his property to one or more of his creditors with intent to give them preference. This is a most interesting case and is very instructive on the points involved here.

In Rice v. Adler-Goldman Commission Co. 18 C. C. A. 15, 36 U. S. App. 266, 71 Fed. 151, it was held that, in the absence of a bankrupt or insolvent law, a debtor may lawfully pay one creditor to the exclusion of others by consenting to a judgment in his favor, and the fact that the transfer is accomplished quickly and secretly is immaterial. This is also an instructive case on the subject.

It is perhaps some indication that J. Tornabells & Company paid most of their debts, when only some half a dozen creditors are attacking them in this suit, because we may presume they had a large number of creditors when they went into suspension of payments. And we might indulge some presumption, also, that when a firm is in suspension of payments, the creditors

themselves are looking out for their rights to see that no wrong is done. Mr. Cornwell, the attorney for the original two or three complainants here, knew all about this transfer, yet he did not attack it for more than two years after it had taken place. When considering the rights of third parties, a court would be inclined, because of this neglect, to say that complainants were estopped by their own laches.

We might have decided this case without writing more than a page, were it not that we felt it was due counsel to set forth our views as to the case under the conditions that obtained when it was argued. We will therefore not quote from the Romeu v. Todd decision, 206 U. S. 358, 51 L. ed. 1093, 27 Sup. Ct. Rep. 724, because its terms are already well known to counsel and the bar generally. It is a legal guide light in the judicial history of this island. It holds, as we read it, that the chancery rule of *lis pendens* has no place in Porto Rican jurisprudence because of the peculiar status of this court, the phraseology of the Foraker law, and the requirements of the mortgage law of the island.

We are therefore inclined to think that the law in Porto Rico is that good, recorded title in the registry of property fully protects innocent purchasers for value, without notice, at all times, and probably protects them even with notice after one year in cases where the conveyance was made in fraud of creditors. However, as we hold that no prima facie case was made by complainants here, our views here expressed as to the scope of the Romeu-Todd decision are not important.

Counsel for complainants, since news of the decision in Romeu v. Todd was brought to the island, because of the fact that his side of the cause has proceeded on the theory of the chancery rule of *lis pendens* being in force, has requested us

Will v. Tornabells & Co.

to grant a new hearing in the premises, in the interest of justice, so that argument might be made as to the effect of this decision of the Supreme Court of the United States, and permit his side to show actual knowledge on the part of some or all of the respondents of the pendency of the suit and the fraud intended by Tornabells & Company. We have given consideration to this respectful request and appreciate its reasonableness, but we fail to see how granting it could affect the result we have here arrived at.

Therefore, for all of the reasons in these views set forth, we are constrained to hold, and do hold, that the complainants have not made such a prima facie case as entitles them to a decree in the premises, and the motion to dismiss the bill will be sustained.

The receiver herein will be required to at once make a complete report in the premises. The court will settle his accounts and see to it that all of his proper debts as receiver are paid, and will not release the property until this is done, and allow him reasonable compensation and deduct it from the funds in his hands, if any, and will at once distribute any money that may remain in his hands to the persons to whom it justly belongs, after the deduction of the costs and expenses connected with the receivership, and will then order the receiver to turn over the several estates to the parties entitled to them. And it is hoped that the parties interested will facilitate this being done and aid in the settlement of the present annoying situation, brought about largely because of a view of the law which it was reasonable to take.

Let proper decrees be prepared under this opinion to carry out its intent, and the whole matter will be considered as interlocutory until the receiver is finally discharged.